# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BROADCAST MUSIC, INC; LESS THAN ZERO MUSIC; SOUTHFIELD ROAD MUSIC; FAKE AND JADED MUSIC; EMBASSY MUSIC CORPORATION; E.O. SMITH MUSIC; TENTATIVE MUSIC, INC; SONY/ATV SONGS LLC; HOUSE OF GAGA PUBLISHING LLC; and REDONE PRODUCTION LLC d/b/a SONGS OF REDONE, | : : : : : : : : : : : | No. 4:16-CV-02233<br><br>(Judge Brann) |
| Plaintiffs, | : : | |
| v. | : : | |
| MCCARTY'S FINISH LINE, INC. d/b/a TAYLOR'S BAR & GRILL; and KEITH T. HYNDMAN, individually, | : : : : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**AUGUST 31, 2017**

Plaintiffs – Broadcast Music, Inc., Less Than Zero Music, Southfield Road Music, Fake and Jaded Music, Embassy Music Corporation, E.O. Smith Music, Tentative Music, Inc., Sony/ATV Songs LLC, House of Gaga Publishing LLC, and RedOne Production LLC d/b/a Songs of RedOne – filed a Motion for Default Judgment against Defendants McCarty's Finish Line, Inc. d/b/a Taylor's Bar & Grill and Keith T. Hyndman. For the reasons that follow, the motion is granted.

## I. BACKGROUND[1]

McCarty's Finish Line, Inc., ("McCarty's") operates Taylor's Bar & Grill ("Taylor's") in Unityville, PA.[2] Mr. Hyndman is the president of McCarty's and the operator and manager of Taylor's. Broadcast Music, Inc. ("BMI") holds the right to license the public performance of over ten million copyrighted musical compositions ("BMI Catalog"), including the compositions which are the subject of this lawsuit.[3] The other plaintiffs own the copyrights to the specific musical compositions which are the subject of this lawsuit.[4]

### A. Initial Contact Between BMI and Mr. Hyndman

In 2010, BMI began contacting Mr. Hyndman and Taylor's about the need, under United States copyright laws, to purchase a license for any compositions from the BMI Catalog that were publicly performed at Taylor's.[5] On June 3, 2010, BMI sent a letter to Mr. Hyndman and Taylor's that explained BMI's purpose and functions, indicated how a license could be obtained through BMI's website, and

---

[1] The facts for this section were drawn from plaintiffs' motion for default judgment and attached exhibits, ECF No. 10; the testimony and exhibits introduced at the hearing on this motion; and plaintiffs' complaint and attached exhibits, ECF No. 1. *See Broadcast Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F.Supp.2d 537, 541 (E.D. Pa. 2008) (when considering a motion for default judgment a court assumes the truth of all factual allegations made in a complaint).

[2] ECF No. 1 ¶ 14.

[3] *Id.* ¶ 3.

[4] *Id.* ¶ 4.

[5] Hearing Ex. P-2.

provided contact information for further questions.[6] Over the next several weeks, BMI placed ten phone calls to Taylor's, leaving several voicemails and messages with employees.[7]

On July 19, 2010, Mr. Hyndman called BMI.[8] On this call, Mr. Hyndman stated that, although Taylor's hosted live music events, an attorney had told him that these performances were "okay" because the music was "changed," and "not the original."[9] The BMI representative nevertheless explained Mr. Hyndman's responsibilities regarding BMI Catalog compositions, and Mr. Hyndman asked to receive more information about the proffered license in order to review it with his attorney.[10] The next day, July 20, 2010, BMI sent a proposed license to Mr. Hyndman.[11]

### B. Further Communications Between BMI and Mr. Hyndman

Mr. Hyndman did not purchase the proposed license. Over the next several years, BMI continued its attempts to contact Mr. Hyndman via mail and telephone, with mixed success.[12]

---

[6] Hearing Ex. P-3.
[7] Hearing Ex. P-2.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] Hearing Exs. P-2 and P-3.
[12] *Id.*

Between August 2010 and September 2016, BMI sent 31 more letters to Mr. Hyndman at Taylor's.[13] Many of these letters explained BMI's organizational purpose and functions, the general operation of United States copyright laws, the potential repercussions for violations of those laws, and the methods by which Mr. Hyndman and Taylor's could purchase a license in order to conform to those laws.[14] Five of them were titled "Cease & Desist Notice" and asked Taylor's to "immediately cease all use of BMI-licensed music."[15] Although most letters were sent via First Class USPS mail, several were sent via FedEx – of which three were "refused by recipient."[16]

During that same time period, BMI placed 43 more calls to Taylor's.[17] On 20 of those calls, a BMI representative spoke with a Taylor's employee and was often able to simply leave a message.[18] A few times, however, the employee indicated Taylor's refusal to purchase a BMI license or was otherwise uncooperative.[19] On December 19, 2011, for example, a BMI representative spoke to a woman – identified as Taylor's general manager and Mr. Hyndman's

---

[13] *Id.*

[14] Hearing Ex. P-3.

[15] *Id.* The "Cease & Desist" letters were sent on January 23, 2012; February 1, 2012; August 3, 2015; March 30, 2016; April 13, 2016.

[16] Hearing Exs. P-2 and P-3. Two of the refused letters were sent on April 13, 2016; the other was sent on October 3, 2016.

[17] Hearing Ex. P-2.

[18] *Id.*

[19] *Id.*

girlfriend – who told the representative that she had spoken to an attorney, that the attorney indicated no license was necessary, and that, therefore, Taylor's would not be purchasing one.[20] On January 19, 2012, an employee demanded proof that Taylor's was playing music from the BMI catalog and requested a list of local establishments with a BMI license.[21] On April 14, 2016, an employee asked BMI to "cease and desist" calling Taylor's.[22] And on May 13, 2016, an employee used "profane language" with the BMI representative and stated that BMI could bring a lawsuit if it so chose.[23]

On several of the calls, a BMI representative spoke with Mr. Hyndman himself, who continued to refuse to purchase a BMI license and to be uncooperative.[24] On December 29, 2011, for example, Mr. Hyndman indicated that he would not purchase a BMI license, that he planned to "go to the district attorney" over the matter, and that it was BMI's responsibility to prove that Taylor's was playing music from the BMI Catalog.[25] On January 19, 2012, Mr. Hyndman said that he would "take his chances in court because [one] cannot get

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

blood from a stone."[26] On March 12, 2015, Mr. Hyndman refused to discuss the matter and hung up on the BMI representative.[27] On April 9, 2015, Mr. Hyndman again refused to discuss the matter with the BMI representative.[28]

On May 21, 2015, in response to a "long and ranting" voicemail left by Mr. Hyndman, a BMI representative again called Mr. Hyndman, who – again in a "long and ranting" manner – indicated that he "look[ed] forward to seeing [BMI] in court."[29]

### C. September 10, 2016 Visit to Taylor's Bar & Grill

On the evening of September 10, 2016, BMI agent Sarah Fama visited Taylor's, making an audio recording and written report of her visit.[30] Her written report indicated that a group named "The Running Joke" performed at Taylor's that evening, and identified three compositions played by the band that came from the BMI Catalog.[31] The audio recording was later analyzed by another BMI agent, who confirmed the performance of the three compositions identified by Ms. Fama and identified two additional BMI Catalog compositions.[32]

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] ECF No. 10, Ex. A.

[31] *Id.*

[32] *Id.* A total of five BMI Catalog compositions were identified: (1) "Inside Out," whose copyright is owned by plaintiffs Less Than Zero Music, Southfield Road Music, and Fake

Following this visit, BMI sent three additional letters to Mr. Hyndman at Taylor's.[33] In an October 3, 2016 letter, BMI informed Mr. Hyndman about Ms. Fama's visit to Taylor's and indicated that it "remain[ed] ready to furnish [Taylor's] with the necessary license at this time."[34] The letter requested license fees dating back to March 2015 as well as the cost of Ms. Fama's services; otherwise, it indicated that there was "no alternative other than to refer this matter to [BMI] attorneys for whatever action they deem necessary."[35] In an October 4, 2016 letter – the final one sent to Mr. Hyndman – BMI stated that, "[s]ince you have not responded to our attempts to resolve the outstanding license for Taylor's Bar & Grill, this matter has been forwarded to BMI's legal Department for further action."[36]

### D. Procedural History

On November 4, 2016, the plaintiffs initiated the instant action. In their complaint, they laid out the facts discussed *supra* and alleged five claims of willful

---

and Jaded Music; (2) "Tainted Love," whose copyright is owned by plaintiff Embassy Music Corporation, (3) "Say It Ain't So," whose copyright is owned by plaintiff E.O. Smith Music; (4) "Good," whose copyright is owned by plaintiff Tentative Music, Inc., and (5) "Bad Romance," whose copyright is owned by plaintiffs Sony/ATV Songs LLC, House of Gaga Publishing LLC, and RedOne Production LLC d/b/a Songs of RedOne.

[33] Hearing Exs. P-2 and P-3.

[34] Hearing Ex. P-3.

[35] *Id.*

[36] *Id.*

copyright infringement under the Copyright Act of 1976,[37] with each of the five identified compositions forming the basis for each one of the claims.[38] They sought injunctive relief, statutory damages, and costs (including attorneys' fees).

Although the defendants were served with a summons on November 15, 2016, they failed to plead or otherwise defend.[39] Therefore, on December 27, 2016, the plaintiffs filed a Request for Entry of Default pursuant to Federal Rule of Civil Procedure 55(a).[40] That same day, the Clerk of Court granted the plaintiffs' request and entered a default against the defendants.[41]

On April 5, 2017, the plaintiffs filed the instant Motion for Default Judgment pursuant to Rule 55(b).[42] The attached declaration of Hope M. Lloyd, an Assistant Vice President of BMI, indicates that BMI had the right to publicly perform the five BMI Catalog compositions performed at Taylor's as well as the right to license the public performance of those compositions.[43] The attached declaration of Brian Mullaney, a Vice President of BMI, verifies the letters sent and calls made to Mr. Hyndman and Taylor's, and confirms Ms. Fama's

---

[37] 17 U.S.C. § 101 *et seq.*
[38] ECF No. 1.
[39] ECF Nos. 5, 6.
[40] ECF No. 8.
[41] ECF No. 9.
[42] ECF No. 10.
[43] *Id.* Ex. 1.

investigation and findings.[44] This declaration also reveals that, had Taylor's purchased a license from BMI for its use of BMI Catalog compositions, its licensing fees would have been $3,128.30 for the period from March 2015 through February 2016 and $3,200.05 for the period from March 2016 through February 2017, for a total of $6,328.35.[45]

Additionally, the motion indicates that the plaintiffs are seeking $25,313.40 in statutory damages, or $5,062.68 per claim of infringement.[46] This figure was apparently calculated by totaling the estimated amount of unpaid license fees due from March 2015 through February 2017 ($6,328.35) and multiplying that figure by four ($6,328.35 x 4 = $25,313.40).[47]

A hearing on damages was held on August 24, 2017. Neither the defendants nor anyone representing the defendants was in attendance at that hearing.[48] The plaintiffs' first witness was John Coletta, a Vice President of BMI; he described BMI's functions and purpose, the method by which BMI calculates its licensing fees,[49] and general procedures for investigating and dealing with infringements of

---

[44] *Id.* Ex. 2.

[45] *Id.*

[46] ECF No. 10.

[47] *Id.*

[48] A court security office ascertained that no one on behalf of the defendants was present on the fourth floor, where there courtroom is located, or in the lobby of the building. Hearing Tr.

[49] Mr. Coletta introduced a document titled "Music Policy/Fee Calculation," which indicated how BMI calculated Taylor's estimated licensing fee of $3,200.05. Hearing Ex. P-4.

works in its catalog. Mr. Coletta also indicated that Taylor's continues to host live music. The plaintiffs' next witness was Brian Mullaney, also a Vice President of BMI. Mr. Mullaney described the licensing process generally and the general methods by which BMI communicated and attempted to communicate with Mr. Hyndman and Taylor's. Mr. Mullaney also discussed some of the specific interactions with those defendants, including of the telephone calls with Mr. Hyndman discussed *supra*.

During the course of this litigation, the plaintiffs submitted several affidavits – attached to their Motion for Default Judgment,[50] at the hearing,[51] and into the record after trial[52] – showing costs and fees expended in this matter in an amount of $14,059.00. This figure included a $400.00 filing fee, a $382.00 process server fee, $608.00 in investigator costs, and $12,669.00 in attorneys' fees.[53]

---

According to this document, BMI first considered whether Taylor's features recorded music or live music (and, if live, how many times a week), whether it charges a cover charge, and whether dancing occurs there. After using this information to calculate a "Total Rate Per Year Per Occupant" (which in this case was $11.15), BMI then multiplied that amount by Taylor's occupancy (287 persons) to come to its figure of $3,200.05. (The 287 occupancy figure was apparently obtained from Mr. Hyndman himself over the phone. Hearing Ex. P-2.)

[50] ECF No. 10, Ex. 3.

[51] Hearing Ex. P-9.

[52] ECF No. 15.

[53] ECF No. 15.

## II. DISCUSSION

### A. Copyright Infringement

To establish a claim of copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work."[54] "Copying," in turn, is "the act of infringing any of the exclusive rights that accrue to the owner of a valid copyright,"[55] which include, for a musical composition, the right "to perform the [composition] publicly."[56]

The uncontested evidence shows that five BMI Catalog compositions were publicly performed at Taylor's, that the plaintiffs own the valid copyrights to those compositions, and that the performances were an unauthorized copying of those compositions. Therefore, the plaintiffs have demonstrated five instances of copyright infringement by the defendants.

### B. Decision to Enter Default Judgment

The decision whether to enter a default judgment under Rule 55(b) is within the court's discretion.[57] When deciding whether to enter such a judgment, a court should consider "(1) prejudice to the plaintiff if default is denied, (2) whether the

---

[54] *Dun & Bradstreet Software Servs. Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3rd Cir. 2002).

[55] *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 207 (3rd Cir. 2005).

[56] 17 U.S.C. § 106.

[57] *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3rd Cir. 2000).

defendant appears to have a litigable defense," and (3) whether defendant's delay is due to culpable conduct."[58]

Here, all three factors weigh in favor of entering a default judgment against the defendants. First, the plaintiffs will be prejudiced if default is denied, as they will not receive revenue for BMI Catalog music that has been played at Taylor's and – since evidence at the hearing indicated that Taylor's continues to host live music – the plaintiffs will continue to suffer infringement of their copyrights. Second, the defendants do not appear to have a litigable defense. The record indicates the public performance of five BMI Catalog compositions at Taylor's, and the defendants have produced no evidence disputing that fact or showing that the performances were authorized – indeed, the defendants, by their default, have produced no evidence at all. Third, the defendants' delay is due to their own failure to participate in these proceedings.[59] Therefore, entry of default judgment against the defendants is appropriate and is ordered.

**C.    Relief**

When considering a claim of copyright infringement, a court may, *inter alia*, enter injunctive relief;[60] may "allow the recovery of full costs," including "a

---

[58] *Id.*

[59] *See also Broadcast Music, Inc. v. George Moore Enterprises, Inc.*, 184 F.Supp.3d 166, 170 (W.D. Pa. 2016) (finding the three default judgment factors met in a similar case).

[60] 17 U.S.C. § 502.

reasonable attorney's fee";[61] and may award damages.[62] For the reasons that follow, all three forms of relief are appropriate in the instant case.

### 1. Injunctive Relief

When deciding whether to grant a permanent injunction, a court must consider "whether (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest."[63]

Here, a permanent injunction is warranted. First, as discussed *supra*, plaintiffs have shown success on the merits of their copyright infringements claims. Second, it is established that a plaintiff who establishes a *prima facie* case of copyright infringement – as plaintiffs have done here – is entitled to a presumption of irreparable harm.[64] Third, granting the injunction will not result in any greater harm to the defendants, as they are still capable of entering into a license agreement with plaintiffs in order to perform BMI Catalog compositions lawfully. Finally, an injunction enforcing copyright laws and protecting

---

[61] 17 U.S.C. § 505.

[62] 17 U.S.C. § 504.

[63] *Shields v. Zuccarini*, 254 F.3d 476, 482 (3rd Cir. 2001).

[64] *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3rd Cir. 1983).

copyrighted works is "by definition in the public interest."[65] Therefore, defendants are permanently enjoined from infringing any of plaintiffs' copyrighted works in any manner.

### 2. Costs and Attorneys' Fees

When considering whether to award costs and attorneys' fees under 17 U.S.C. § 505, a court should consider, *inter alia*, "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."[66] A finding of bad faith, however, is not required for such an award.[67]

Here, an award of costs and attorneys' fees is warranted. Over the course of several years, defendants repeatedly refused to cooperate with BMI to bring their establishment into compliance with copyright laws. BMI gave defendants numerous opportunities to avoid legal action, sending more than 30 letters and making more than 40 phone calls that explained defendants' legal duties and offered a relatively uncomplicated method by which to comply with those duties. The record reveals BMI's patience and its desire to use the legal process only as a

---

[65] *Broadcast Music, Inc. v. Spring Mount Area Bavarian Resort, Ltd.*, 555 F.Supp.2d 537, 544 (E.D. Pa. 2008).

[66] *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151, 155-57 (3rd Cir. 1986).

[67] *Id.*

last resort. Defendants' conduct was objectively unreasonable, and an award of costs and attorneys' fees will (at least partially) compensate plaintiffs for their efforts vis-à-vis Taylor's and serve to deter future violations of copyright laws by defendants and others. Therefore, the defendants are ordered to pay the plaintiffs $14,059.00 for costs and attorneys' fees accrued in prosecuting this matter.

### 3. Statutory Damages

In a copyright infringement case, a court may award either actual or statutory damages.[68] For each proven claim of copyright infringement, a court may award statutory damages "in a sum of not less than $750 or more than $30,000[,] as the court considers just"; for each proven claim of *"willful*[]" copyright infringement, a court may award statutory damages of up to $150,000.[69] Statutory damages are meant to compensate plaintiffs, but are also designed to deter and discourage future wrongful conduct.[70] The trend in similar cases in the Third Circuit – indeed, in the Middle District of Pennsylvania – has been to award

---

[68] 17 U.S.C. § 504(a)-(b). A court may not award *both* actual and statutory damages. *Id.*

[69] 17 U.S.C. § 504(c)(1).

[70] *See, e.g.*, *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952) (upholding award of maximum statutory damages and noting that "[t]he statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury, but also is designed to discourage wrongful conduct"); *Rodgers v. Eighty Four Lumber Co.*, 623 F.Supp. 889, 892 (W.D. Pa. 1985) (noting that "statutory damages should exceed the unpaid license fees so that defendant will be put on notice that it costs less to obey the copyright laws than to violate them" (internal quotation marks and citation omitted)).

statutory damages in an amount equal to approximately three times the defendant's unpaid licensing fees.[71]

Here, plaintiffs seek statutory damages in an amount equal to four times the amount of defendants' estimated unpaid licensing fees – *i.e.*, $25,313.40, or four times the estimated unpaid licensing fees from March 2015 through February 2017.[72] While this is higher than other recent, similar cases, it is justified. As discussed above, BMI, on dozens of occasions over the course of several years, contacted the defendants in order to explain the defendants' responsibilities under the copyright laws and to offer a relatively uncomplicated procedure to comply with those responsibilities – *i.e.*, by purchasing a license. The defendants, however, repeatedly and consistently refused to cooperate. They outright refused to purchase the proffered licenses, and ignored scores of messages, voicemails, and letters. Their employees – perhaps on instruction – participated in the refusal to purchase the proffered licenses and in obstructing BMI's efforts to communicate

---

[71] *See, e.g.*, *Broadcast Music, Inc. v. George Moore Enterprises, Inc.*, 184 Fed.Supp.3d 166, 172 (W.D. Pa. 2016) (noting, while awarding approximately three times the unpaid licensing fees, that it was "follow[ing] well-settled law within the Third Circuit"); *Broadcast Music, Inc. v. Kujo Long LLC*, 2014 WL 4059711 (M.D. Pa. 2014) (awarding slightly less than three times the unpaid licensing fees); *Broadcast Music, Inc. v. Shane's Flight Deck, Ltd.*, 2010 WL 4916208 (M.D. Pa. 2010) (awarding approximately three times the unpaid licensing fees); *Broadcast Music, Inc. v. It's Amore Corp.*, 2009 WL 1886038 (M.D. Pa. 2009) (awarding approximately 3.5 times the unpaid licensing fees). *But see Broadcast Music, Inc. v. Station House Irish Pub & Steakhouse, Ltd.*, 2014 WL 3943846 (M.D. Pa. 2014) (awarding approximately 1.35 times the unpaid licensing fees).

[72] It is unclear why the plaintiffs calculated the unpaid fees beginning in March 2015 and not some earlier date – *e.g.*, sometime in 2010, when they first reached out to Mr. Hyndman and Taylor's.

and work with the defendants, sometimes doing so in "profane language." Mr. Hyndman himself threatened to "go to the district attorney" over the matter, refused to speak with BMI representative on some occasions, spoke in a "long and ranting" manner on other occasions, and seemingly dared BMI to bring the instant action. This egregious behavior justifies an award slightly higher than those in recent copyright infringement cases in this Circuit; therefore, the requested award of $25,313.40 is granted.[73]

### III. CONCLUSION

For the reasons discussed *supra*, the defendants are permanently enjoined from infringing any of the plaintiffs' copyright works in any manner. Also for the reasons discussed *supra*, the plaintiffs are awarded $25,313.40 in statutory damages and $14,059.00 in costs and attorneys' fees.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[73] Because this award represents a statutory damages award of $5,062.68 for each proven claim of infringement – well below the statutory cap of $30,000 for non-"willful[]" violations – it is unnecessary for this Court to determine if defendants' copyright infringements were "willful[]" under 17 U.S.C. §504(c)(1).